IN THE MATTER OF THE ALLEGED UNETHICAL AND UNPROFESSIONAL CONDUCT OF HYMAN BRODSKY, AN ATTORNEY-AT-LAW OF THE STATE OF NEW JERSEY, PRACTICING IN HUDSON COUNTY.

Argued November 17, 1958—Decided December 15, 1958.

388

*Mr. John F. Lynch* argued the cause for the Committee.

*Mr. Hyman Brodsky* argued the cause *pro se*.

The opinion of the court was delivered by
WEINTRAUB, C. J.    The Hudson County Ethics and Grievance Committee filed two presentments against respondent after hearings upon the separate complaints of Anna Yanover and Lawrence M. Saiewitz.

## THE YANOVER MATTER.

In a personal injury suit, respondent recovered a judgment for $5,000 on behalf of Sidney Yanover, brother of the complainant Anna. About mid-December 1957 respondent received checks from two carriers, each in the sum of $2,600.18, being one-half of the total paid in satisfaction. By letter dated December 13, 1957 counsel for one of the carriers delivered its draft upon the following terms:

"This draft is being forwarded to you with the understanding that you will retain sufficient funds from the proceeds to insure liquidation, settlement and release of all outstanding hospital, medical or other liens against James Noonan."

Respondent did not pay the mentioned lienors but rather immediately used the funds for his personal benefit. To justify this patent breach of trust, respondent says his client loaned to him his share of the proceeds, including the moneys due to the hospital and doctors, and that in respondent's opinion his client had the power thus to relieve him of his obligation. The record demonstrates the factual claim is as false as the legal proposition is frivolous. Indeed, the story of the "loan" is one of overreaching and fraud upon the client and constitutes the second phase of the matter.

Sidney Yanover, cousin of respondent, is a mute. According to his sister Anna, with whom Sidney has lived for many years, his mentality is "not even [that] of a 10 year old child." He had no schooling except for a period in a "deaf and dumb" school when he was 10 or 12 years old, and cannot read or write except to sign his name. Through the years he supported himself with odd menial jobs. His savings account revealed a meagre balance.

Respondent prepared a closing statement which Sidney signed. The expenses of trial were $188.50 which were deducted from $5,000, leaving a balance of $4,811.50. Of this, respondent claimed 50% pursuant to his retainer agreement, $2,405.75 thus remaining to be paid to or for the mute. The statement continues:

"To be paid Hosp. & Drs.

 Bay. Hosp.'s bill ......... 648.50 (will take 100 less)
 Dr. Hertzberg ............ 400. (agreed with Ins. Co.
            to pay same)
 Dr. Frank ......... ..... 350. (agreed with Ins. Co.
            to pay same)
         1398.50
And due Sidney Yanover $1007.25."

The foregoing statement was attached to what respondent calls the agreement to lend the moneys to him. The alleged agreement, in which the subject of a loan is astutely submerged, reads in full:

"I have read the Statement attached to this sheet. The figures have been explained to me. I am entitled to One thousand and seven 25/100 ($1007.25/100) as my share of the money received by my lawyer Hyman Brodsky in payment the $5000.00/100 judgement he got for me in my case against Cornelius F. McCarthy and James A. Noonan. My sister Anna Yanover wants me to give her this money. I do not want to give it to her and I now tell and instruct my lawyer not to give her any of my money.

I want my lawyer to hold this money for me and give me about $25.00 a week or more as I desire it, need it, and want it. My lawyer Hyman Brodsky can use this money if he likes to do so. I do not want any interest from him. He is my cousin and I have great faith and trust in him.

If he is able to secure a reduction in the amounts due the Bayonne Hospital and Dr. Frank and Dr. Hertzberg from the money he promised to pay them and due them for medical services given to me. I agree to pay him (25%) twenty five percent of any such sums saved by him for me and I am to receive the difference in the same way I receive my other money. I also consent that he pay Dr. Grossman a reasonable fee for going to court for me and testifying in my case.

Received from Hyman Brodsky the sum of $85.00 out of the above money owed to me which I have entrusted him to take over for me and gave to him as a loan."

Sidney's signature then appears. The "borrower" did not sign.

Needless to say the writings on their face repel respondent's testimony that the mute purported to lend any of the moneys due the hospital or doctors. And the testimony is convincing that he never intended any loan at all. Respondent conceded that his client had no independent advice.

There was no witness to the event. There was no reason for the mute to lend the money. Respondent protested that he wanted to part with the funds but feared that Anna would make off with them or that the mute would waste them on a gypsy girl friend. Apparently the only alternative which occurred to respondent was a loan to himself. His testimony reads:

"Q. And that was your sole purpose in having this agreement executed? A. No, my sole purpose was I didn't know what to do. I didn't want to give him the money. I told him: 'The best thing for you is to take a few dollars and lend the rest to me. I will give you six percent interest.' He said, 'Yes.'
Q. Were you in need of funds at the time? A. What's that?
Q. Were you in need of funds at the time? A. Well, I'm always in need of funds."

We note in passing that the "agreement" stated, "I do not want any interest from him. He is my cousin and I have great faith and trust in him." Thus confronted, respondent explained that "Later on, or at that time I said to him, 'I'm going to pay you interest.' I have an agreement not to pay him interest. I thought it would be fairer to pay him interest, so I changed the agreement." In sum total, the transaction appeared to respondent in these terms:

"Q. And your primary purpose was to safeguard the young man's funds and pay him interest? A. I safeguarded his fund. I used some money that I could use. There was two purposes. He got a favor and I got a favor."

Respondent produced Sidney as his witness, insisting he could read. The mute was tested by the Committee and his inability to read was so conclusively demonstrated that respondent conceded it for the record. Respondent's ostensible purpose was to prove that the mute understood and consented to the loan. But respondent abandoned that effort after the following occurred:

"Q. Do you want me to give her the money? A. (Answer unintelligible to the stenographer.)

Q. Do you want me to give Anna, your sister, the money? A. * * * myself * * * I * * * boss * * * yes. (Balance of answer unintelligible to the stenographer.)

Q. Did you want me to hold the money for you? A. I want it in the bank.

Chairman Lynch: The question was: Do you want Mr. Brodsky to hold the money for you? You said, 'No.' You want it in the bank. Is that right?

The Witness. Yes."

By way of explanation of this quotation, we add that Sidney could utter sounds, which in some instances were understandable in part. His testimony was elicited by questions calling for categorical answers, given by a nod or shake of the head. The testimony revealed that Sidney did not desire anyone, including respondent, to hold his money for him, but rather wanted it in his own bank account.

Anna's complaint alleged that a check given by respondent to Sidney was returned unpaid. Respondent did not answer this allegation. On May 28, 1958 the Committee asked respondent to produce his bank records. The testimony recounted above was given thereafter on August 5. On the latter occasion respondent pleaded he had forgotten the direction to produce the records. He was thereupon ordered to produce them and also cash for the amount due the hospital, doctors and the client by August 8, to which respondent agreed. He failed to comply, and his failure continues to this day. (Upon the argument before us, respondent produced receipts indicating that the doctors, doubtless wearied and worn, had accepted less than the amounts due them, apparently in September 1958. The hospital bill remains unpaid.)

The hearing before the Committee was continued to August 26. A subpoena was served upon respondent to produce his records. On August 24 he sent a telegram reading:

"Have been ordered by my doctor to Bayonne Hospital for immediate operation for tumor. Will enter hospital Monday Be operated on Tuesday Aug 26 Therefore will be unable to appear at hearing on Tuesday Aug 26th Kindly put same off."

The Committee's investigation indicating the contents of the wire were untrue, the hearing proceeded in respondent's absence. An officer of the bank at which respondent had had his accounts was examined. For present purposes it is enough to say that the bank's records show that respondent opened a trustee account apparently because of this transaction; that some 17 checks payable to the mute on the trustee account (including the $85 "payment" which appears in the "loan" agreement) were dishonored either for want of funds or because the account was closed by the bank on January 21, 1958, at which time the bank closed respondent's regular account as well. During a period a few months before that date, the number of checks on both accounts issued without sufficient funds was over 250. Respondent's practice was to issue checks without regard to his bank balance and then to seek covering funds. It is here appropriate to recall respondent's testimony on August 5:

"Q. Didn't you think it incumbent upon you as an attorney, borrowing money from a client, particularly a handicapped client, that you owed him the duty of independent advice? A. How much was it after all? It was only five, or six hundred, or seven hundred dollars. It wasn't a fortune. I would make it good easily if I had to and wanted to, if he insisted on it."

Respondent was immediately notified that the testimony of the bank officer had been taken and that the subpoena to produce records and the direction to produce the cash remained in effect. He did not seek to reopen, nor did he produce the records or the moneys.

After our order to show cause was served, respondent moved before us that the matter be returned to Committee so that he could attack the credibility of the bank officer. The notable omission in his affidavit (dated November 7, 1958) upon the motion was the failure to deny the pertinent facts to which the officer had testified as set forth above. The Committee moved to suppress the affidavit because of scandalous allegations. We are satisfied the affidavit is scandalous for the sake of scandal and diversion. The Committee's motion to suppress is granted. Respondent's

motion to remand is denied. It is denied for want of a showing (a) that anything material would be added, and (b) that his failure to appear on August 26 was other than deliberate.

As to (a), we add that respondent on the argument before us orally insisted that every check to the mute was paid. We granted him leave to present documentary proof. He delivered nine checks and filed an affidavit saying:

"The following 9 checks which he [the officer of the bank] specifically testified and identified by date and amount as having been returned were honored and paid by my bank."

This sworn statement is quite startling, because on their face four of the nine checks were returned because the account was closed and were never paid by the bank, and the other five contain evidence substantiating the banker's testimony that they were dishonored when initially presented.

As to (b), it would unduly lengthen this opinion to detail respondent's affidavit with respect to his inability to attend the hearing of August 26. We are satisfied from the answering affidavits of the doctors that respondent sought vainly to gain admittance to a hospital to make good the misrepresentation in his telegram; that he had an olecranon bursitis which was not disabling, did not require hospitalization or immediate treatment, and was relieved by aspiration. No doctor supported respondent's statement that hospitalization was advised.

At the argument before us, respondent was granted additional time to file a brief. He filed none. Instead he submitted an affidavit in which, contrary to his testimony before the Committee, he asserted that the mute did have independent advice; that some time during the litigation the mute's brother-in-law, an attorney who has not practiced since 1935, "suggested to him and to me that he not give any money that he would receive in the case to his sister Anna Yanover but that he lend it to me" and "I only learned two days ago that [the brother-in-law] spoke to Mr. Yanover several times before the settlement and advised him to lend

the money to me on the above terms, and also about the time that the money was received (December 1957) he again spoke to Sidney Yanover and told him that he should lend the money to me and receive it back in weekly payments of about $50.00 per week." It is not clear whether this affidavit was submitted to support the motion to remand. At any rate, the Committee promptly filed an affidavit of the brother-in-law in which he denied all such conversations and advice, and added that he has not seen the mute since some time before the trial of the negligence case; that on November 23, 1958 (after the date of respondent's affidavit) he came to respondent's home at the latter's request, and declined to accept respondent's offer to pay to him the sum of $623 estimated by respondent to be the balance due. We do not hesitate to find that these additional statements by respondent are fabrications. We see no reasonable basis for a remand to the Committee.

We have related the facts at some length because of the seriousness of the conclusions we have reached. We have no doubt that respondent misappropriated the moneys and overreached a handicapped client in a shabby and shameful manner. The offense is aggravated by respondent's failure to appreciate the immorality of his conduct, by his transparent efforts to delay and obstruct, his continued defiance of the Committee's subpoena and directions, and his willingness to swear to anything to avoid an embarrassment of the moment. We can find no hope or promise that respondent could remain at the bar with safety to the public. This unhappy conviction is further indicated by the Saiewitz matter and the record of prior disciplinary proceedings against respondent.

### The Saiewitz Matter.

In October 1957 respondent executed a sublease of an apartment in New York City to be occupied by two young ladies, one of whom he claims to be his niece by a former marriage. The agreed rental was $250. He gave a check

for $500 representing a security deposit of $250 and the first month's rent. Thereafter he gave a further rent check of $250. Both checks were returned for insufficient funds. Respondent claims an agreement to delay deposit and asserts a flimsy defense to the rent, which need not be discussed. The testimony clearly reveals a fraud.

### PRIOR DISCIPLINARY PROCEEDINGS.

On January 25, 1938 respondent was suspended for one year for failure to account for a client's funds. On June 11, 1942, again in a matter involving funds, respondent escaped with a reprimand because the attorney-client relationship was not involved. On April 26, 1943 he was again suspended for one year for misappropriating moneys of a client. In that matter there appeared the same aggravating circumstance we find here, to wit, a callous indifference to truth. He there swore that since May 27, 1941 he had in his possession 30 specific $100 bills which he produced, whereas in fact a considerable amount of that currency had not been issued or put into circulation until after that date.

The name of respondent will be stricken from the roll of attorneys-at-law.

*For disbarment*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*Opposed*—None.